355 So.2d 831 (1978)
Dale James KING, Appellant,
v.
The STATE of Florida, Appellee.
No. 76-2093.
District Court of Appeal of Florida, Third District.
February 21, 1978.
Rehearing Denied March 22, 1978.
*832 Bennett H. Brummer, Public Defender and Thomas G. Murray, Asst. Public Defender and Larry Bessen, Legal Intern, for appellant.
Robert L. Shevin, Atty. Gen. and Arthur Joel Berger, Asst. Atty. Gen., for appellee.
Before HAVERFIELD, C.J., and HENDRY, J., and DREW, E. HARRIS (Ret.), Associate Judge.
DREW (Ret.), Associate Judge.
During the early morning in September, 1974, a shotgun was fired into a crowd of people on N.W. 96th Street in Miami. Two people were killed, two injured. April 1975 appellant Dale James King was apprehended in Minnesota, placed under arrest there and subsequently extradited to face trial in Dade County. King and two others, Phillip Brannon Courtney and James Randolph Jacobs, were indicted jointly by the Grand Jury on the 4th of May for the murders of the two individuals and for the attempted murder of the two who were wounded. King was tried separately, found guilty on all four charges and, upon recommendation of the jury and the concurrence of the trial judge, sentenced to life imprisonment on the murder charges and to 15 years imprisonment on the attempted murder charges. This appeal is from that sentence and judgment.
Appellant argues five points on this appeal. The first point is that the court erred in excusing the State's failure to comply with the discovery demands of the defendant with respect to two witnesses and a photograph.
Fla.R.Crim.P. Rule 3.220, provides:
"(a) Prosecutor's Obligation.

*833 (1) After the filing of the indictment or information, within fifteen days after written demand by the defendant, the prosecutor shall disclose to defense counsel and permit him to inspect, copy, test and photograph, the following information and material within the State's possession or control:
(i) The names and addresses of all persons known to the prosecutor to have information which may be relevant to the offense charged, and to any defense with respect thereto.
* * * * * *
(xi) Any tangible papers or objects which the prosecuting attorney intends to use in the hearing or trial and which were not obtained from or belonged to the accused."
The violation of this rule, for obvious reasons, does not in itself require a reversal of a conviction by an appellate court. Harm or prejudice to the defendant which results from a violation of the rule by the State, or a failure of the State to furnish the name of a witness or witnesses known by the State to have information relative to the offense charged, or to any defense of the defendant with respect thereto, which results in harm or prejudice to the defendant does require a reversal.[1]
While the trial court has discretion to make the determination of harm or prejudice, such discretion can be exercised only after it has made an adequate inquiry into all of the surrounding circumstances and this fact must appear in the record to enable the appellate court to properly assess the correctness of the trial court's ruling.[2] The Richardson case[3] sets forth the factors which the trial court must consider in exercising its discretion with respect to a violation of such rule, as follows:
"... [w]hether the [state's] violation was inadvertent or willful, whether the violation was trivial or substantial, and most importantly, what effect, if any, did it have upon the ability of the defendant to properly prepare for trial." Richardson, supra, at 775.
King, on May 10, 1976, pleaded not guilty and invoked discovery under the rule. Written demands for discovery were filed May 13th and June 1st. Five weeks later the State filed its response. The trial commenced the following October 5th. In his opening argument, the attorney for the State said it would prove that King, with two other people, drove by the location of the homicide and that King fired the fatal shot from the car. The defense, in its opening statement, said the shot was not fired by King but probably by two named individuals who, earlier in the evening, fought with and threatened to kill some of the people at the party.
The State presented two witnesses, Ms. Davis and Mr. Jorge Barragan, whose names did not appear on the list of witnesses furnished by the State. Their testimony placed King in a white car with others at or near the scene of the shooting on the evening of the homicide. After objection by the defense because of the failure of the State to furnish their names as witnesses prior to trial, and a short interruption of the trial to allow defense counsel to confer with the witnesses, such objections were overruled and they were permitted to testify. King argues here that the only "inquiry" as set forth in Richardson (supra, note 1) was the following statement when the objection to Barragan's testimony was made, viz:
"THE COURT: But I find none that I have heard about, the delay has been prejudice (sic) to you, but it doesn't do me any good to discuss outside of the presence of the reporter how we stand on witnesses, you know, and you make me think we are in good shape to go."
*834 We hold that the inquiry by the trial judge was adequate under the circumstances to meet the requirement of Richardson. Failure to comply with the rule should not result in the exclusion of relevant evidence from the jury unless no other remedy suffices.[4] Here the trial was interrupted and defense allowed to interview these witnesses. After interviewing the witnesses, defense counsel did not request any additional remedy nor did he demonstrate any prejudice from the failure to list the witnesses originally. Moreover, as to Ms. Davis, the record shows that the defense knew she was an eye witness who claimed to be able to identify King as one of the perpetrators of the crime some three months before the trial at a lineup.
"Once again the state may have violated a Rule. But when that fact was discovered, the trial judge properly denied the request to exclude the witness or to recess the trial to enable defense counsel to obtain a ballistics expert of his own. Seeking a less drastic remedy, he recessed the court to allow the defense counsel to depose the expert before he was called to the stand. Since the defense should have been aware of the state's proposed proof by reason of information already known to it, the trial judge acted within the scope of his discretion to remedy whatever prejudice might have resulted from the state's breach." Cooper v. State, supra at 1138-1139.
"The reason behind the rule requiring exchange of witness lists incident to discovery is to prevent prejudicial surprise. [citations omitted]
"Certainly the rule has a laudable purpose, and should be complied with. However, when, as here, the opposing party is fully acquainted with the witness and with his anticipated testimony, thus where there can be no surprise, and where the necessity for calling the witness occurs as a result of unforeseen circumstances which developed during the trial (or immediately preceding the trial, Bell v. State, [(Fla. 2d DCA 1974) 287 So.2d 717,] supra) and where it is apparent that no prejudice can result as a result of the failure to list the witness, then, under such circumstances, the rule should not be blindly followed. The purpose of the rules, indeed the purpose of the law, is to achieve justice not frustrate it." C.A.W. v. State, 295 So.2d 329 (Fla. 1st DCA 1974), at 330-331.
We also hold that the trial court did conduct a sufficient inquiry concerning the failure to list Barragan. The inquiry revealed the failure was inadvertent, that this witness had been interviewed by the defense shortly before. The claim of prejudice was that the defense desired a deposition and the opportunity to investigate what the witness would testify about. This was, in effect, a motion for a continuance of the trial and the court was justified in denying it. Moreover, the record establishes that the defendant suffered no prejudice from being precluded from conducting a further investigation of this witness. His testimony was that he had heard two shotgun blasts on the evening in question and saw a white car in the vicinity of the crime. He did not witness the crime and could make no positive identification of the car and could not identify the occupants. At best, his testimony was cumulative to other evidence and added little, if anything, to the facts contained in the statement made by King to the officers in Minnesota to which we shall refer more fully hereafter.
During the course of the trial the State desired to introduce a photograph of the defendant which was taken in Minnesota by Minnesota authorities several hours after the defendant had given his formal statement when the defendant was being booked into the Elk River Minnesota jail. Prior to its admission into evidence an inquiry was conducted by the trial court. The trial court's inquiry revealed that the State had not obtained this photograph from the police until the day of the trial. It is clear, therefore that Criminal Rule of Procedure 3.220(f)'s requirement of prompt production of additional new material at *835 best resulted in a technical violation of lack of promptness measured by hours, as opposed to days. "... failure to obey the Rule should be remedied in a manner consistent with the seriousness of the breach. Relevant evidence should not be excluded from the jury unless no other remedy suffices."[5] The trial court obtained an admission from the defendant that this photograph was one of the defendant and, predicated upon its knowledge of the law and the defense's defense as revealed by the defense's opening statement, determined that this photograph should not be excluded from evidence. This photograph was an item of demonstrative evidence merely supportive of oral testimony. Of the various potential sanctions available to the trial judge pursuant to Rule 3.220(j), the only sanctions in fact available in a situation where the violation is the failure to display a physical exhibit, as opposed to revealing a witness, were exclusion of this photograph, a sanction which Cooper v. State, supra, pronounced to be a last resort, or the granting of a continuance. The trial court's ruling was in keeping with the Supreme Court's decision.
In summary, we hold that, a proper inquiry having been made by the trial judge concerning the unlisted witnesses, Davis and Barragan, and the unlisted photograph, and the trial court having determined that such failure did not prejudice the defendant in his defense, the holding of the Supreme Court in Cumbie[6] that a reversal is required where the trial court fails to apprise itself of all the circumstances surrounding a breach of the discovery rule, is inapplicable. This case is controlled by Richardson, supra, which was reaffirmed and especially recognized in Cumbie and the rulings of the trial court in each instance are affirmed under the authority of the Richardson decision.
The third point on appeal is that the trial court erred in allowing the prosecutor to elicit testimony from a police officer, that the defendant, while in custody and in the face of accusation, exercised his right to remain silent, and allowing the prosecutor to cross-examine the defendant as to his pre-trial exercise of his right to remain silent while in custody and in the face of accusation, thereby violating the defendant's right to be free from self-incrimination.
When King was arrested in Minnesota, he made a full and complete confession of the murders. The voluntariness of the confession was proven by two Minnesota officers, the Minnesota court reporter and two Miami officers who had journeyed to Minnesota to secure King. The facts of the arrest, the subsequent questioning by the officers after a full and detailed reading of and discussion with King of his rights under Miranda, his narration of the events of the evening of the murders which were transcribed by the reporter, but not signed by King, convinced the trial judge and the jury that the confession was made freely and voluntarily by King. Our study of this evidence, the statement of King and the supporting proof of other witnesses establishes, even beyond a reasonable doubt, that this confession was the voluntary, uncoerced product of the mind of King and correctly related the tragic and callous actions of this defendant and his two confederates on that tragic night. It is a story that shocks the mind. In the words of King, this is what occurred:
"A Yes, we were riding along and we wanted to shoot the shotgun off again and Brannon wanted to shoot some niggers with it.
Q Do you recall his exact statement?
A `Let's go shoot some niggers.'
* * * * * *
Q And what was your reply to that?
A `No.'
Q And do you recall Jim Jacobs' reply?
A `No.'
Q What then occurred?
A Then he said `Oh, what is the matter. You guys scared?', and pretty soon he had us talked into it and we *836 were all for it. Each one of us wanted to shoot it and it ended up Brannon drove while I shot it and Jim was in the back seat.
Q And just how did you come by this area? I believe you stated between 96 and 98 on to 26th Avenue?
A We were going up 103rd Street, I think, towards 26th Avenue from 35th Court, and Brannon made a right on 26th Avenue and we were driving by and seen a bunch of people in the front yard, so Brannon said, `There you go, shoot them.'
Q These bunch of people you referred to in the front yard, were they white or black?
A Black.
Q Did they appear to be doing anything there?
A Just standing there talking, I think.
Q How many would you say approximately were standing there?
A Maybe six, I think. I don't know.
Q You stated you drove by and observed them. Do you recall what direction you were travelling in?
A Going from One Hundred Third Street towards 95th Street.
Q When you reached 95th Street, what, if anything, did you do?
A We made a U-turn.
Q You then returned north on 26th Avenue?
A Right.
Q Do you recall, were the lights on or off on the vehicle when you were turned?
A Brannon turned the lights off after we turned around.
Q At the time the shotgun was handed to you, I believe you stated by Brannon 
A Yes.
Q  to your knowledge was it loaded, or did you load it?
A It was loaded, I think.
Q As you passed the area where these blacks were standing, what, if anything, did you do?
A I just pointed the gun and pulled the trigger. I pointed it into the crowd.
Q How many shots did you fire?
A Just one."
The State's case was primarily predicated on King's confession, and the issue of its voluntariness was raised from the inception, it being King's contention that he was threatened with the electric chair but that if he cooperated he would get off with second degree murder;[7] that he was physically mistreated by slamming his head on a table and that he was refused an attorney.
King bases his third point on the following question and answer which was asked and received at the extradition hearing in Minnesota, viz:
"Q [By Mr. Graves] At any time after these statements were given to the police officers and prior to the defendant leaving Elk River, Minnesota, did you hear him make any other comments about the case?
We are speaking of the charges that were against him.
A No."
Appellant also alleges the prosecutor continued this incursion upon appellant's fifth and fourteenth amendment rights during his cross-examination of the defendant in the trial, as follows:
"Q Now when you got in there before the judge and the judge explained your rights concerning extradition, certainly you told the judge the statement the police had taken from you was taken because they had beaten you and threatened you with the electric chair, didn't you?
A No."
* * * * * *
*837 "Q Well, did you say anything about the statement?
A No, I did not.
Q You knew that you had been forced into giving this confession on a first degree murder case for which you could get the electric chair and you didn't tell the judge in Minnesota, `Judge, they are framing me'? You didn't tell him that?
A No, I did not.
Q Were your parents with you at the extradition proceedings?
A No.
Q Was anybody from your family at the extradition proceedings?
A No.
Q Did anybody go up to the judge and say, `Judge, they are framing my son'? Your parents, did any of them, to your knowledge, do that?
MR. YEDLIN: Objection.
THE COURT: Sustained. He already answered they weren't there.
Q [By Mr. Graves] I am asking outside of the hearing, did your parents ever go to the judge either prior to the hearing or after the hearing saying `They forced my son to make this statement. Please don't let them extradite him'?
A Not that I know of.
Q Did you or your parents ever call the Governor of the State of Minnesota and say `Governor, the police officers from the State of Florida have forced me,' or your parents say, `have forced my son, implicating him in a first degree murder case for which he could get the death penalty'?
A No.
Q Do you know the governor of your state has to approve any extradition of you to the State of Florida?
A No.
Q You didn't think the governor would do anything for you either?
A No.
Q How about this lawyer that your parents were getting you? Why wasn't he at the extradition hearing?
A I don't know.
Q Did you have your lawyer present a petition to the judge saying, `Your Honor,' whatever this judge's name is, `The State of Florida has forced my client to give a statement against his will without an attorney being present and we are going to fight the extradition proceedings'? ..."
* * * * * *
Q During that period of time that you were afraid, were you just afraid of Detective Goedecke or the charge of first degree murder?
A I don't know. I was afraid. That is all I can tell you.
Q Just afraid of everything; is that right?
A I was afraid for my life.
Q But you never told that Judge up in Minnesota, did you?
A No, I didn't."
It will be noted that the critical questions asserted by King to violate his right to remain silent under the Constitution did not occur during the trial. And, the State says the challenged testimony in the total context of the preceding and subsequent testimony shows that the State was directing its inquiry solely to the issue of the voluntariness of the confession which was the central theme of the interrogation. In each instance, the question related to a time after King had confessed. It is highly illogical to assume that the State was using, or had any reason to use, King's silence as any proof of guilt after he had made a full and complete confession of the crime.[8] Silence to show a state of mind proving that a confession is voluntary is not the same as silence to show, or tend to show, guilt of the substantive event.
*838 In Greenfield v. State, 337 So.2d 1021 (Fla. 2d DCA 1976) the State sought to use a defendant's silence to meet its burden of proving that the defendant was not insane at the time he committed the crime. The State did so by eliciting testimony as to what the defendant did and said when he was arrested shortly after the commission of the crime. This testimony included the fact that after being given Miranda warnings, the defendant said that he understood them but did not desire to speak to the police until after he consulted an attorney. In rejecting a claim that this testimony ran afoul of the general law that the State cannot utilize the fact that a defendant exercised his right to remain silent after being given Miranda warnings, the Second District stated:
"While we do agree that, at least in the face of an objection, testimony or prosecutorial comment relating to a defendant's insistence on the right to remain silent generally constitutes reversible error, we are of the view that under the circumstances of this case the general rule ought not apply.
"When insanity is raised by plea as a defense, and evidence thereof is forthcoming prima facie sufficient to raise a reasonable doubt, the state no longer can travel on the presumption of sanity; it must establish sanity beyond a reasonable doubt as with every element of the offense charged. Certainly, evidence of the conduct and apparent state of mind and awareness of an accused, particularly where, as here, it is connected closely in point of time to the crime charged, is relevant to this issue; and it would be manifestly unfair to permit a defendant prima facie to establish a defense and then preclude the state from meeting it by barring relevant evidence to the contrary because of the `Miranda' rationale. "Here, for example, the evidence relied upon by the state was perhaps the most competent evidence on appellant's mental capacity at the time of the offense available, being so closely connected to the res gestae. It was neither unfair to introduce it nor improper to comment upon it in summation; . .."
The confession of King, his admission of guilt to the witness Rodriguez, Davis' eyewitness identification of the defendant and the other facts proven in this case overwhelmingly establish the defendant's guilt beyond any reasonable doubt. He had the aid of highly qualified and diligent counsel and received every protection the law provides to assure a fair trial to one accused of crime. A trial like this, covering several days and producing thousands of pages of testimony and exhibits cannot be conducted with computer precision. The defendant is not entitled to a perfect trial. He is entitled to a fair one. The harmless error statute of this and every other jurisdiction we are aware of is in recognition of the fact that human institutions are fallible. It is only where an error in a trial is of such a nature as to be harmful or prejudicial to a defendant that he is entitled to be discharged or tried anew. We find no such error in the proceedings which we have discussed in detail, nor in points two, four and five which we have carefully considered.
Affirmed.
NOTES
[1] Richardson v. State, 246 So.2d 771 (Fla. 1971). Also see Anderson v. State, 314 So.2d 803 (Fla. 3rd DCA 1975); Carnivale v. State, 271 So.2d 793 (Fla. 3rd DCA 1973).
[2] Ramirez v. State, 241 So.2d 744 (Fla. 4th DCA 1970).
[3] Footnote 1, supra.
[4] Cooper v. State, 336 So.2d 1133 (Fla. 3rd DCA 1976).
[5] Cooper v. State, supra, footnote 4.
[6] Cumbie v. State, 345 So.2d 1061 (Fla. 1977).
[7] Compare Bordenkircher v. Hays, U.S. Supreme Court, ___ U.S. ___, 98 S.Ct. 663, 54 L.Ed.2d 604, in which it was held that the Due Process Clause of the U.S. Constitution is not violated when a state prosecutor carries out a threat made during plea negotiations to have the accused re-indicted on a more serious charge on which he is plainly subject to prosecution if he does not plead guilty to the offense with which he was originally charged.
[8] Miller v. State, 343 So.2d 1292 (Fla. 3rd DCA 1977).